# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CLEAN HARBORS, INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. N15C-07-081 MMJ CCLD |
| v. | ) | |
| | ) | |
| UNION PACIFIC CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: September 18, 2017
Decided: November 15, 2017

## OPINION

Richard L. Renck, Esq., Christopher M. Winter, Esq., Mackenzie M. Wrobel, Esq., Duane Morris LLP, Paul L. Feldman, Esq. (Argued), Gary S. Matsko, Esq. (Argued), Christopher J. Marino, Esq., Davis Malm & D'Agostine, P.C. Attorneys for Plaintiff Clean Harbors, Inc.

Ann L. Al-Bahish, Esq. (Argued), Lauren K. Valastro, Esq., Kelley Drye/Jackson Gilmour & Dobbs, Norton A. Colvin, Jr., Esq., Mitchell C. Chaney, Esq., Colvin, Chaney, Saenz & Rodriguez, LLP, Stephen B. Brauerman, Esq., Sara E. Bussiere, Esq., Bayard, P.A., James W. Semple, Cooch and Taylor, P.A. Attorneys for Defendant Union Pacific Corporation.

**JOHNSTON, J.**

## FACTUAL AND PROCEDURAL CONTEXT

Before the Court are post-trial motions related to a breach of contract case.

Plaintiff Clean Harbors, Inc. ("Clean Harbors") sued Union Pacific Corporation

("UPC"), for breaching an environmental indemnity provision in a stock purchase

contamination from a hazardous waste facility its predecessor purchased from UPC. On a motion for summary judgment, this Court ruled that Clean Harbors was entitled to indemnification under the SPA.[1] The parties went to trial to determine the reasonableness of the extent of cleanup performed by Clean Harbors, whether Clean Harbors complied with the SPA's notice provisions, and the amount of indemnification UPC owed Clean Harbors. At trial, the jury found that both parties breached the contract, but awarded Clean Harbors $9,180,445.76 and UPC $0.

UPC now moves for a new trial based on issues it raises with the jury's verdict, the jury instructions, and the jury verdict form.

Clean Harbors has filed two motions of its own. It moves for attorneys' fees and costs and for prejudgment interest.

## MOTION FOR NEW TRIAL STANDARD

To warrant granting a motion for a new trial, "the verdict must be manifestly and palpably against the weight of the evidence or for some reason, or combination of reasons, justice would miscarry if it were allowed to stand."[2] Delaware law gives great deference to jury verdicts.[3] "In the face of any reasonable difference of opinion, courts will yield to the jury's decision."[4] When the court considers a motion

---

[1] *Clean Harbors v. Union Pacific Corporation*, 2017 WL 1175664, at *5 (Del. Super.).
[2] *Broderick v. Wal-Mart Stores, Inc.*, 2002 WL 388117, at *1 (Del. Super.).
[3] *Brittingham v. Layfield*, 2008 WL 4946217, at *3 (Del.).
[4] *Id.*

2

for a new trial, "there is a presumption that the jury verdict is correct."[5]

## ANALYSIS

### UPC's Motion for New Trial

At the conclusion of the trial, the jury completed a verdict form. Question 1 asked: "Did Union Pacific breach the contract?" The jury selected "YES." Question 2 asked: "Did Clean Harbors breach the contract?" The jury selected "YES." Question 3 asked: "ONLY if you answered 'YES' to Question 1: What was the total reasonable cost of the environmental clean-up?" In response, the jury wrote "$9,180,445.76." Question 4 asked: "ONLY if you answered 'YES' to Question 2: What amount would fairly and reasonably compensate Union Pacific for Clean Harbors' breach of contract?" In response, the jury wrote "$0."

### The Jury's Verdict on the Total Reasonable Cost of the Environmental Clean-Up is Not Against the Great Weight of the Evidence

UPC argues that the jury's response to Question 3—that the reasonable cost of cleanup for the Wichita Facility was $9,180,445.76—went against the great weight of the evidence presented at trial. It contends that the evidence at trial demonstrated that Clean Harbors accrued most of its claimed damages by pursuing an unnecessarily expensive cleanup process chosen only to meet the indemnity deadline. Clean Harbor counters by noting that its numerous expert and lay

---

[5] *Daub v. Daniels*, 2013 WL 5467497, * 1 (Del. Super.).

3

deadline. Clean Harbor counters by noting that its numerous expert and lay witnesses presented evidence in support of its contention that its cleanup efforts were reasonable in scope and cost.

The Court can only set aside a verdict for being against the great weight of the evidence if "the evidence preponderates so heavily against the jury verdict that a reasonable jury could not have reached the result."[6] No such drastic evidentiary imbalance existed in this case. Instead, the jury heard and considered a classic battle of the experts and the verdict demonstrates that the jury found Clean Harbors' evidence more persuasive. Additionally, the verdict demonstrates that the jury did not completely adopt Clean Harbors' version of events while ignoring UPC's contentions. Consistent with UPC's evidence that certain costs were not reasonable, the jury reduced Clean Harbors' request for relief by $1,500,000.[7]

Considering the evidence heard at trial, the Court finds that the credibility of UPC's witnesses, as opposed to Clean Harbors' witnesses, presents, at most, a "reasonable difference of opinion."[8] Therefore, the Court must "yield to the jury's decision."[9] The Court finds the jury's verdict was not against the great weight of the evidence.

---

[6] *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1979).
[7] May 24, 2017 Trial Tr., 141:4–5 ("[T]he total cleanup cost that Clean Harbors is asking for is the $10,680,445."). The jury awarded Clean Harbors $9,180,445.76.
[8] *Daub v. Daniels*, 2013 WL 5467497, * 1 (Del. Super.).
[9] *Id.*

4

## The Jury Verdict Form
## Did Not Confuse the Jury

UPC also argues that the verdict form confused the jury on the issue of damages, because it asked for the "total reasonable cost" of the clean-up without specifying a time period. The SPA indemnified Clean Harbors for expenses, incurred up to 2014, for cleaning up contamination that existed at the time of the SPA in 1994. UPC argues that the jury's verdict may have included costs outside of that indemnification period.[10] However, neither party argued or presented evidence that Clean Harbors' claim for damages included clean-up costs incurred after 2014. Indeed, both parties' opening and closing arguments reminded the jury only to consider damages within the indemnification period.[11]

---

[10] UPC further contends that the Court's verbal directive to the jury regarding the total cost—that the Court "would do the math and figure it out"—confused the jury, because it led the jury to believe it could not subtract expenses outside of the indemnification period from its verdict. May 24, 2017 Trial Tr., at 256:20–257:3. This argument fails because, in context, it is clear the Court was instructing the jury to refrain from performing contractually mandated calculations, not instructing the jury to include costs outside of the indemnification period. *See id.* (telling the jury, "[d]on't subtract anything that was paid . . . don't figure out 80 percent" in reference to UPC's 80% responsibility for the costs under the SPA, minus a prior UPC payment needed to calculate the final amount owed).

[11] May 24, 2017 Trial Tr., 143:5–14 ("Your job is to give us the whole picture: What was the reasonable amount that should have been spent from . . . the notice in '98 until December 31, 2014."); *Id.* at 223:14–19 ("No one disputes that there had been contamination in this facility before 1994, but that's all the railroad was responsible for under the agreement and under the document."); May 9, 2017 Trial Tr., 12:6–7, 13:17–19 ("It had to relate to contamination that existed as of December 31, 1994 . . . This was an indemnification that lasted for 20 years."); 43:1–3 ("[E]xpenditures for environmental liabilities only lasted for 20 years after the closing date of the transaction, which was December 31 of 1994.").

UPC names only two instances from the three-week trial in which a witness mentioned the cost of Clean Harbors' clean-up after 2014. In both instances, the attorney elicited the testimony in a way that made clear that those expenses were not within the indemnity period. UPC first points to a Clean Harbors employee's testimony that Clean Harbors spent, "[v]ery generally, about $2 million" on clean-up after 1994.[12] However, UPC fails to note that the witness provided this information in response to the question, "And how much did it spend after 2014 *outside of the indemnification?*"[13] Similarly, when a UPC witness stated that there was "4 more million dollars' worth of costs" in 2015, she prefaced that statement with an explanation that she was describing the "Clean Harbor interim remedy" and that "although [Clean Harbor is] recovering costs from Union Pacific in 2014 *because that's when the indemnity clock ended*, the remedy actually went into 2015 . . . ."[14] The Court finds those two minimal, contextualized references to post-2014 expenses did not confuse the jury.

The Court also finds that the jury was not confused as to whether it should have included costs arising out of pre-1994 contamination in its verdict. The Court must not consider the "total reasonable cost" language of the verdict form in isolation—"the entire instruction is considered with no statement to be viewed out

---

[12] May 11, 2017 Trial Tr., at 89:12–14.
[13] *Id.* (emphasis added).
[14] May 22, 2017 Trial Tr., at, 136:15–20; 139:2–9 (emphasis added).

of context."[15] Jury Instruction 7 provided important context. It stated: "Under the terms of the contract, Union Pacific is only obligated to indemnify Clean Harbors for contamination at the Wichita Facility that arise out of or in connection with acts or omissions occurring prior to December 31, 1994." Given that plainly-stated directive, and Delaware law's presumption "that the jury followed the trial judge's instruction,"[16] the Court holds the verdict form did not cause the jury to incorporate damages outside the indemnity period into its verdict.

UPC raises an additional argument concerning the verdict form. It claims that Verdict Form Questions 3 and 4 caused prejudice against UPC because the questions were not identical. However, Verdict Form Questions 3 and 4 were different in order to make the jury's task as clear as possible. Determining the amount UPC owed required a calculation as mandated by the SPA, which, as previously discussed, the Court did not want the jury to attempt to compute. Asking for the "total reasonable cost of the environmental cleanup"—in other words, the input for the SPA formula—removed a layer of complexity for the jury. Instruction 9 informed the jury what standard it should apply for reasonableness, and Instruction 8 reminded and explained to the jury Clean Harbors' duty to mitigate damages, making the meaning of Question 4 even clearer.

---

[15] *Haas v. United Technologies Corp.*, 450 A.2d 1173, 1170 (Del. 1982).

[16] *Reinco, Inc. v. Thompson*, 906 A.2d 103, 112 n.20 (Del. 2006) (citing *Fuller v. State*, 860 A.2d 324, 329 (Del. 2004)).

UPC requested the following language for what became Question 4: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Union Pacific for its damages, if any, that resulted from such breach of contract?" UPC's proposed language is not substantively different from the actual Question 4 on the final Verdict Form.

The Verdict Form asked the jury to make specific findings of fact. When considered together with all of the instructions, the Verdict Form was neither confusing nor prejudicial to UPC.

<u>The Jury Instruction 5 is a<br>Correct Statement of the Law and<br>Did Not Cause an Inconsistent Verdict</u>

UPC argues that it is entitled to a new trial because Jury Instruction 5 misstated the law by not being reasonably informative. Instruction 5 stated, in relevant part: "[T]o establish that Union Pacific breached the contract, Clean Harbors must prove that . . . Clean Harbors substantially performed its obligations under the contract . . . ." UPC asserts that this instruction was insufficient because it should have included an additional instruction on material breach or a definitional instruction for substantial performance.

"A party is not entitled to a particular jury instruction but does have the unqualified right to have the jury instructed on a correct statement of the substance

8

of the law."[17] "A trial court's charge to the jury will not serve as grounds for reversible error if it is 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.'"[18]

The language of UPC's proposed instruction for substantial performance shows that the Court's decision to exclude it did not mislead the jury. In relevant part, it reads: "A good-faith attempt to perform a contract, even if the attempted performance does not precisely meet the contractual requirement is considered complete if the substantial purpose of the contract is accomplished. This means that the contract has been completed in every significant respect." Failing to inform the jury that substantial performance exists when the "substantial purpose of the contract is accomplished" is hardly misleading according to the "standards of verbal communication." Nor is it against common practices—the pattern jury instruction for breach of contract does not include substantial performance as an element, much less define it.[19] The Court declined to explicitly state the obvious—that the law defines a phrase in line with its common meaning. This decision does not warrant a new trial.

---

[17] *R.T. Vanderbilt Co. Inc. v. Galliher*, 98 A.3d 122, 125 (Del. 2014).
[18] *Ross v. State*, 2001 WL 129075 (Del.) (quoting *Flamer v. State*, 490 A.2d 104, 128 (Del. 1984)).
[19] Del. P.J.I. Civ. § 19.20 (2000).

The Court also had no reason to independently instruct the jury on the concept of material breach. Case law relied upon by UPC in its proposed instructions noted that material breach and substantial performance are simply the inverse of one another.[20] If a party substantially performs, there is no material breach; if there is a material breach, the breaching party cannot have substantially performed. Instruction 5 already stated Clean Harbors' obligation to substantially perform its contract to prove UPC's breach. Stating the same thing negatively—UPC did not breach if Clean Harbors materially breached the contract—would have been redundant. The Court's decision not to include a redundant instruction did not mislead the jury.

The Court also did not err in declining to include the requested instructions, because whether there is "sufficient evidence to warrant the requested instruction is a matter within the sound discretion of the trial court."[21] UPC put on evidence in an

---

[20] *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 317 n.8 (3rd Cir. 2001) (interpreting New Jersey law and concluding "we see no real or practical difference between a conclusion that a party materially breached a contract, and a conclusion that the party failed to substantially comply with its obligations under a contract. To decide otherwise would be simply to engage in linguistic games"). It appears no case applying Delaware law has yet stated this logical inference, but Delaware courts applying other states' laws have. *See TA Operating LLLC v. Comdata, Inc.*, 2017 WL 3981138, at *33 n.388 ("In Tennessee, the termination of a substantially complete contract constitutes a material breach of contract because substantial completion of a project equates to substantial performance of the contract.") (quoting *Roy McAmis Disposal Serv., Inc. v. Hiwasee Sys., Inc.*, 613 S.W.2d 226, 228 (Tenn. Ct. App. 1979)); *Hipcricket, Inc. v. mGage, LLC*, 2016 WL 3910837, at *12 n.143 ("[I]f it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered, and further performance by the other party is excused.") (quoting *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 317 P.3d 543, 550 (Wash. App. 2014)).

[21] *Coles v. Spence*, 202 A.2d 569, 570 (Del. 1964).

attempt to prove that Clean Harbors committed several material breaches—or, put another way, failed to substantially perform its contract. Its evidence did not persuade the jury. Though the jury found that Clean Harbors breached its contract, it did not award UPC any damages. This finding is not inconsistent with the trial evidence.

UPC further contends that Jury Instruction 5 led to inconsistent Verdict Form responses. In both Questions 1 and 2, the jury wrote responded "YES" to whether UPC and Clean Harbors, respectively, breached the contract. Jury Instruction 5 required a party to establish it "substantially performed its obligations under the contract" to prove the other party breached the contract. UPC argues both parties could not have breached, as the jury indicated, and also have substantially performed.

This position would mean that under no circumstances could more than one party breach a contract. Such a contention is inconsistent with contract law and common sense. UPC essentially argues that a finding of substantial performance precludes a finding of *any* breach, including one that is non-material. This is contrary to the law. As previously explained, where there is a substantial performance, there can be no material breach. This does not mean, however, that substantial performance precludes a non-material breach. Parties suffering non-material breaches are not excused from performance as they would be had they

11

suffered a material breach, but they still may recover damages.[22] There is no inconsistency in the jury finding that the parties both substantially performed the contract and breached the contract.

**The Jury Was Properly Instructed
Not to Consider Speculative Evidence**

UPC argues Jury Instruction 4 was improper. That instruction states:

> I have determined, as a matter of law, that it would be speculative for any expert or witness, to testify about what the government regulators would or would not have done with a particular set of facts or circumstances if they had only been asked. Any such testimony that you heard, or think you may have heard, during the course of this trial should be ignored and disregarded. Of course, this does not mean that you should disregard testimony about what government regulators did or did not do.

UPC argues that this instruction was inappropriate because it instructed the jury to only consider the cleanup method Clean Harbors actually approved, not alternative methods Clean Harbors could have approved—an improper exclusion of valid expert testimony. UPC also contends that the Court should not have excluded evidence of cleanup efforts at other sites. In response, Clean Harbors maintains that Instruction 4 properly directed the jury only to ignore speculative testimony. It contends that the excluded testimony would have consisted of guesswork rather than

---

[22] *Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916, at *19 (Del. Super.) ("Although a material breach may allow the non-breaching party to be excused from future performance, a non-material breach does not; instead, the non-breaching party may recover any damages that it can prove.") (quoting Restatement (Second) of Contracts § 241 (1981)).

12

the application of known principles to a hypothetical scenario. Clean Harbors also argues that the Court did not err in excluding evidence of cleanups at other sites, because the ruling prevented a trial within a trial.

Contrary to UPC's assertion, Instruction 4 did not instruct the jury to disregard evidence of alternative clean-up approaches. Instead, it only instructed the jury to ignore testimony "about what the government regulators would or would not have done with a particular set of facts or circumstances if they had only been asked." This did not mislead jurors into ignoring what other efforts Clean Harbors could have undertaken to mitigate UPC's indemnification obligation. UPC was not limited in presenting evidence of alternative approaches. The feasibility of more circumscribed cleanup methods and what regulators may or may not have approved are two distinct issues. Speculation about what government regulators may have done is not dispositive of the practical and fiscal reasonableness of the method Clean Harbors selected.

Additionally, the Court was correct to limit the scope of the trial to the facts and circumstances of the actual site at issue. Allowing evidence of other sites would have substantially extended the time required for trial and created a great risk of jury confusion.[23] The only relevant issue was what constituted a reasonable cleanup

---

[23] *Hoey v. State*, 689 A.2d 1177, 1180 (Del. 1997) ("A trial within a trial, based entirely on extrinsic evidence, invariably will lead to jury confusion.").

13

method for this site. The jury heard extensive expert testimony as to what other remediation methods would have worked on this site. It was well within the Court's "broad discretion" to limit the trial to relevant evidence and to exclude evidence of tenuous relevance.[24]

### Clean Harbors' Motion for Attorneys' Fees and Costs

Clean Harbors argues that as an indemnified party, it is entitled to recover the fees and costs it incurred by suing to enforce its indemnification rights. It is UPC's position that Clean Harbors should not recover attorneys' fees because the SPA does not allow for it.

Generally, Delaware courts do not award attorneys' fees unless specifically provided for by contract or statute.[25] However, the Delaware Supreme Court has held that where "a party . . . is contractually entitled to be held harmless, that party is entitled to its costs and attorneys' fees incurred to enforce the contractual indemnity provision."[26] The case law strongly suggests that the award of fees in the presence of a hold harmless clause is not automatic. Rather, the contract must have a broad indemnity clause that includes attorneys' fees.

---

[24] *Czech v. State*, 945 A.2d 1088, 1095 (Del. 2008).
[25] *Honaker v. Farmers Mutual Ins. Co.*, 313 A.2d 900, 904 (Del. Super. 1973).
[26] *Delle Donne & Associates, LLP v. Millar Elevator Service Co.*, 840 A.2d 1244, 1256 (Del. 2004).

14

Both the contracts in *Delle Donne* (the most recent Delaware Supreme Court case to express this principle) and its predecessor, *Pike Creek*,[27] included broad indemnity clauses explicitly including fees. In *Pike Creek*, the court specifically noted that the indemnification clause was "very broad in scope" when it provided indemnification against "any liabilities and expenses, including attorney's fees."[28] Likewise, the court in the later *Delle Donne* case also noted that the indemnity provision was "very broad in scope" when it required the indemnitor to hold the indemnitee harmless "from and against all expenses, including reasonable attorneys' fees."[29] The Chancery Court and courts in other jurisdictions interpreting this aspect of Delaware law repeatedly have noted the importance of the broad indemnification language to the holdings in *Pike Creek* and *Delle Donne*.[30]

Though vital to the analysis, the breadth of the indemnification language is not the only consideration. As a federal district court synthesizing Delaware law on this subject concluded: "[A] broadly worded indemnification agreement for legal

---

[27] *Pike Creek Chiropractic Center, P.A. v. Robinson*, 637 A.2d 418 (Del. 1994).
[28] *Id.* at 422–23.
[29] *Delle Donne*, 840 A.2d at 1256.
[30] *See Perconti v. Thornton Oil Corp.*, 2002 WL 982419, at *8 (Del. Ch.) (stating that *Pike Creek* "teaches that a contractual indemnification provision, 'very broad in scope,' is construed under Delaware law to include the right to recover the costs of successful efforts to vindicate those indemnification rights," but ultimately declining to apply *Pike Creek* to the corporate indemnification context); *Warren Drilling Co., Inc. v. Equitable Production Co.*, 621 Fed. Appx. 800, 807 (6th Cir. 2015) ("*Pike Creek* makes clear that Delaware adopts the Alaska rule in the context of indemnity clauses that require an indemnitor to hold the indemnitee harmless 'against any liabilities and expenses, including attorney's fees' that 'result from any acts and [o]missions' of the indemnitor"); *Plumrose (USA) Inc. v. Penske Truck Leasing Co., L.P.*, 2005 WL 2416331, at *3 (N.D. Ind.) (noting the broad language of the indemnification clause in *Pike Creek*).

15

expenses and attorneys' fees will be read to encompass *inter se* claims unless the parties provide otherwise in the agreement."[31]

*Home Insurance Company v. American Insurance Group*[32] provides an example of parties agreeing not to provide attorneys' fees for enforcement costs within a broadly worded indemnification clause. This Court declined to apply *Pike Creek* in a duty to defend action, despite an agreement to hold the indemnitee harmless "from any and all claims," because the indemnification clause at issue held the indemnitee "harmless only in actions commenced against [indemnitee] alleging that [indemnitor] was responsible for the injuries."[33] The Court found that because "[t]he action seeking to enforce the duty to defend does not fall within that contractual language," *Pike Creek* did not apply and it awarded no costs and fees associated with the action.[34]

Therefore, it would be proper to award attorneys' fees in this case if the SPA's indemnity clause is analogous to the broad indemnity provision of *Pike Creek* without containing a *Home Insurance*-style provision that evinces an intent to limit

---

[31] *Plumrose*, 2005 WL 2416331, at *5.

[32] 2003 WL 22683008 (Del. Super.).

[33] *Id.* at *5. The full language of the *Home Insurance* indemnity clause is: "Abacus Security Services hereby agrees to defend, indemnify and hold harmless [Dover Mall] from any and all claims against [Dover Mall] alleging that injury to person or property was directly caused by Abacus Security Services or its employees." *Id.* at *1.

[34] *Id.* at *5.

the award of attorneys' fees to specific scenarios. The Court turns to the SPA to make this determination.

Section 9.1 of the SPA addresses costs and expenses. It states: "Except as otherwise expressly provided in this Agreement, each party hereto shall pay all of its own fees and expenses as to the negotiation, preparation, execution and performance of this Agreement, including the fees and expenses of its own counsel . . . ." However, this blanket statement does not end the inquiry because another section expressly provides for payment of attorneys' fees.[35]

Section 3.23.3(b) defines "Environmental Liabilities" broadly to include attorneys' fees.

> "Environment Liabilities" means any and all costs. . . expenses (including charges and assessments, and expenses and costs of investigating, preparing or defending any action or proceeding) . . . court costs and attorneys' fees incurred or imposed (i) pursuant to any agreement, order, notice of responsibility, directive . . . attributable to, connected with or arising out of or under Environmental Laws or (ii) pursuant to any claim by a government authority or other person for personal injury, property damage, damage to natural resources, remediation or response costs arising out of, connected with or attributable to, any Hazardous Substance.

---

[35] Section 11.8 also mentions attorneys' fees. It defines "Claim" broadly as "including, in each case, interest, penalties, reasonable attorneys' fees and other costs and expenses for investigating or defending any actions or threatened actions, disbursements, settlement costs, deficiencies, levies and duties." However, the appearance of the term "attorneys' fees" in Section 8.10—which exclusively governs the SPA's indemnification provisions—is in the phrase "Third Party Claim." As this is a claim between the contracting parties, its appearance there is not useful for this analysis.

17

This definition is critical to understanding Section 8.10 of the SPA, which directly addresses Union Pacific's environmental indemnification obligations. Section 8.10's preamble states that UPC "shall have no liability or obligation to indemnify . . . except as specifically set forth in this Section 8.10." 8.10(a) continues:

> Union Pacific shall reimburse, indemnify, defend and hold harmless [Clean Harbors] from against and in respect of 80% of all Environmental Liabilities that may be imposed upon asserted against or incurred by [Clean Harbors] and which . . . are attributable to a Third Party Claim.

Referring to the relevant language from the Section 3.23.3(a) definition of Environmental Liability, this dispute turns on UPC's agreement "to indemnify and hold harmless" Clean Harbors from "any and all costs . . . expenses . . . court costs and attorneys' fees incurred or imposed . . . pursuant to any . . . order . . . attributable to . . . Environmental Law or pursuant to any claim by a government authority or other entity . . . for . . . remediation or response costs" which are "attributable to a Third Party Claim."

The Court finds that the SPA does not allow for recovery of attorneys' fees for this dispute. Though the SPA contains broad "any and all" language in a manner similar to the clauses in *Pike Creek* and *Delle Donne*, the SPA contains an agreement, like that in *Home Insurance*, that attorneys' fees may only be recovered in a particular type of action, which does not include the one at issue here.

18

The Section 3.23.3(b) definition of Environmental Liabilities demonstrates that UPC only agreed to indemnify Clean Harbors against claims brought by third parties—not claims between the two contracting parties. UPC agreed to indemnify Clean Harbors for "expenses (including charges and assessments, and expenses and costs of investigating, preparing or *defending* any action or proceeding)." (emphasis added). The use of the word "defending" shows that the agreement intends to indemnify Clean Harbors from actions brought against it by another party—not to pay for actions Clean Harbors brings against UPC. Similarly, in Section 8.10, UPC agreed to indemnify Clean Harbors for "Environmental Liabilities imposed upon, asserted against or incurred" by Clean Harbors. Once again, the SPA is providing indemnification for actions brought against Clean Harbors, not actions brought by Clean Harbors.

Section 3.23.3(b) goes on to make this even clearer when it names the only two situations in which UPC is responsible for "any and all" of Clean Harbors' attorneys' fees. UPC is responsible for fees "incurred or imposed pursuant to any agreement, order, notice of responsibility, directive . . . attributable to, connected with or arising out of or under, Environmental Laws" or for fees incurred or imposed "pursuant to any claim by a government authority or other entity or person for personal injury, property damage, damage to natural resources, remediation or

19

response costs arising out of, connected with or attributable to, any Hazardous Substance."

The SPA does not define "pursuant to." "[W]hen the language of a . . . contract is clear and unequivocal, a party will be bound by its plain meaning . . . ."[36] "Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."[37] Black's Law dictionary defines "pursuant to" as "in compliance with; in accordance with; under."[38]

This Court previously has ruled as a matter of law that the Clean Harbors remediation work at the center of this dispute is an Environmental Liability attributable to a Third Party Claim pursuant to Section 8.10(a).[39] However, there is a fine, but dispositive, distinction between Clean Harbors' remediation costs and the attorneys' fees incurred in this dispute. Clean Harbors incurred remediation costs in the underlying dispute in compliance with—that is, "pursuant to"—directives from government agencies. Those costs fit within the precise definition of Environmental Liability under the SPA for indemnification. Had Clean Harbors incurred attorneys' fees in order to comply with the government agencies' directives, those costs would

---

[36] *Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728, 738 (Del. 2006) (citations omitted).
[37] *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del. 1992).
[38] Black's Law Dictionary (10th ed. 2014).
[39] *Clean Harbors v. Union Pacific Corporation*, 2017 WL 1175664, at *4 (Del. Super.).

20

have fit within the definition as well. However, the costs Clean Harbors has incurred in *this* action—an enforcement action between the two contracting parties—were not incurred "in compliance" with one of the two scenarios enumerated by the SPA as indemnified. Clean Harbors did not bring this suit to comply with the government directives; it brought it on its own initiative. Like the action in *Home Insurance*, this action simply "does not fall within [the SPA's] contractual language."[40]

Section 8.10's statement that UPC holds Clean Harbors harmless for Environmental Liabilities "attributable to Third Party Claims" does not alter this conclusion. Though "attributable to" suggests a breadth that may encompass derivative actions such as the present one, the definition of "Environmental Liabilities" is Clean Harbors' only plausible basis for recovering attorneys' fees. The definition of "Environmental Liabilities," as discussed, specifically limits attorneys' fees incurred "pursuant to" two narrowly defined types of third party actions. With that in mind, it is clear that "attributable to Third Party Claims," is a—redundant, perhaps inartfully drafted—statement emphasizing that there is no indemnification for claims between the two contracting parties.

UPC agreed to hold Clean Harbors harmless only for suits arising in specific circumstances brought by third parties, not for an enforcement action between the two contracting parties. *Pike Creek* and *Delle Donne* are inapplicable to an

---

[40] *Home Insurance*, 2003 WL 22683008, at *5.

indemnification provision with such limiting language.[41] The Court awards Clean Harbors no attorneys' fees.

## Clean Harbors' Motion for Prejudgment Interest

The Court holds that this motion is stayed as premature. The Court will determine the amount of prejudgment interest at the time a final judgment is entered.

## CONCLUSION

Union Pacific Corporation's Motion for a New Trial is hereby **DENIED**. The jury's verdict was not against the great weight of the evidence, the jury instructions were proper, and the jury verdict form did not confuse the jury or cause UPC to suffer prejudice.

Clean Harbors' Motion for Attorneys' Fees is hereby **DENIED**. The language of the SPA does not allow for recovery of attorneys' fees in an action to enforce the agreement's indemnification clause.

Clean Harbors' Motion for Prejudgment Interest is hereby **STAYED**. The Court will determine the amount of prejudgment interest at the time a final judgment is entered.

**IT IS SO ORDERED.**

_____
The Honorable Mary M. Johnston

---

[41] *Id.*

22